Filed 9/20/22  P. v. Dempsey CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078667 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE391509) |
| COURTLEN JAMESCATES DEMPSEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed and remanded with directions.

Justin Behravesh, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski, Alana R. Butler, and Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant Courtlen Jamescates Dempsey guilty of carjacking (Pen. Code, § 215, subd. (a))[1] and robbery (§ 211). The court granted Dempsey three years formal probation on certain terms and conditions.

On appeal, Dempsey argues his conviction must be reversed because the prosecutor committed prosecutorial misconduct by misstating the burden of proof in his opening statement. Dempsey also argues an electronics search condition of his probation is unconstitutionally overbroad. Lastly, Dempsey argues the sentencing minute order and the order granting formal probation must be corrected to reflect that all discretionary fees and fines were satisfied by his time in custody.[2]

We conclude it is not reasonably likely that the jury applied an incorrect standard of proof and therefore, the prosecutor did not commit misconduct in his opening statement. We also conclude that any facial challenge to the electronics search probation condition fails on the merits, and Dempsey forfeited his as-applied challenge by failing to assert it in the trial court. We reject Dempsey's claim of ineffective assistance of counsel for defense counsel's failure to object to the probation condition. Finally, we conclude the court must correct its order granting formal probation to reflect the appropriate amount of custody credits for time served, clarify the number of days the court ordered Dempsey to serve, and address whether any custody credits remain to satisfy discretionary fees and fines. Accordingly, we affirm

---

[1]    Unless otherwise indicated, statutory references are to the Penal Code.

[2]    Dempsey also raised an issue in his opening brief regarding the probationary period under section 1203.1, but conceded the issue in his reply brief. Based on Dempsey's concession, we do not address this issue.

the judgment but remand to the trial for resentencing in accordance with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Robbery and Carjacking*

On May 19, 2019, 52-year-old T.T. was working as a pizza delivery driver. At 9:35 p.m. that evening, T.T. left the pizza store in his 2014 black Ford Fiesta to deliver an order to the 500 block of South Orange Avenue, in El Cajon, which was about eight to 10 minutes away. T.T. arrived at a dark residential street, parked, and walked to look for the address. He was about 50 feet away from his Ford Fiesta when two men approached him with blue bandanas covering their faces.

The shorter person, referred to as suspect one, told T.T. to hand over the pizza, and his money, car keys, and wallet. After T.T. refused, he was hit with a blunt object on the top right side of his head. T.T. believed it was suspect two who hit him because he was looking directly at suspect one and did not see suspect one hit him. T.T. was then told to give up his cell phone and car keys, which he did. Finally, T.T. was told to " 'just turn around and walk away.' " As T.T. walked up the street, he heard his Ford Fiesta being started and turned around to watch it being driven away. The two men had taken T.T.'s Ford Fiesta, smart phone, keys, and $20. An ambulance brought T.T. to a hospital, where he received 14 stitches.

At trial, T.T. described suspect one as being a stocky man, five feet seven inches to five feet nine inches tall, weighing about 220 to 230 pounds. He described suspect two as skinnier, six feet tall, and about 170 to 180 pounds.

### B. *Police Find Dempsey in the Stolen Ford Fiesta*

On May 30, 2019, at around 2:40 a.m., a sergeant at the Corning Police Department received a license plate reader alert indicating a vehicle that was

stolen out of El Cajon was in the area. When the sergeant arrived to where the vehicle was last seen, he observed T.T.'s black 2014 Ford Fiesta at a gas station. Dempsey was in the driver's seat and his girlfriend, Michelle C. was in the back seat with a one-year-old child.

When the sergeant informed Dempsey that the vehicle was reported stolen out of El Cajon, Dempsey did not seem shocked, scared, or surprised. As the sergeant instructed Dempsey and Michelle to step out of the vehicle, Dempsey's friend Matthew P. walked out of the gas station.

Dempsey told the sergeant that two weeks prior, he came from Laughlin, Nevada to San Diego with Matthew to meet Michelle. Dempsey claimed Matthew P. "took off and left" shortly after they arrived in San Diego, and later contacted Dempsey from Washington. Dempsey stated he rode a Greyhound bus to Washington on May 25, 2019, to meet up with Matthew P. and another person named Jacob. Dempsey further claimed he, Michelle, and the child stayed at Jacob's residence for a short time until they were "kicked out" and Jacob gave Dempsey the keys to the Ford Fiesta to drive back to San Diego.

The sergeant arrested Dempsey and Matthew P. and seized two cell phones. Three blue bandanas were also recovered from the Ford Fiesta.

Dempsey is approximately six feet tall. He weighed approximately 265 pounds at the time of his arrest in May 2019, and he weighed around 240 pounds when he was booked into the San Diego County jail. Matthew P. is approximately five feet 11 inches tall and weighed around 140 pounds.

C. *Forensic Cell Phone Data Places Dempsey at the Scene of the Robbery and Carjacking*

A detective from the El Cajon Police Department received the two cell phones and learned that one belonged to Dempsey and the other belonged to Matthew P.

4

A geospatial analysis of the cell phone records revealed that on the night of the crime, both phones were in the Pine Valley area at around 8:00 p.m. By 8:54 p.m., both phones showed cell activity within the 500 block of South Orange Avenue, El Cajon, near the scene of the crime. Matthew P.'s phone called the pizza restaurant at around 8:54 p.m. Both phones showed activity in the El Cajon area until 9:29 p.m., showed movement from 10:01 p.m. to 10:32 p.m., and showed activity back in Pine Valley at 10:32 p.m.

A search of Matthew P.'s phone revealed a photo of Matthew P. and Michelle's baby together on May 20, 2019, the day after the crime. There was also a screenshot of a news article regarding the robbery, taken on May 21. On May 22, a screenshot of a Google Map was taken, showing the phone's location on the I-5 in Shasta County in Northern California. There was also a video of Matthew P. and Dempsey inside T.T.'s Ford Fiesta, taken on May 22. Finally, there was a photo of Matthew P. posing in front of T.T.'s Ford Fiesta holding a blue bandana, and another photo of Dempsey in front of T.T.'s Ford Fiesta with a blue bandana covering his face, both taken on May 25.

On Dempsey's phone, there were multiple Google searches conducted on May 26, regarding extradition from Spanaway, Washington to Nevada.

D. *Trial Testimony Implicates Dempsey in the Robbery and Carjacking*

When he was arrested on May 30, 2019, Matthew P. told the Corning Police sergeant that he had met a person named Jacob two months prior, and it was Jacob who ordered the pizza, told T.T. to hand over his things, hit T.T., and told Matthew P. to get into T.T.'s Ford Fiesta. When he was interviewed by the El Cajon Police detective on June 3, Matthew P. again claimed that it was "Jacob Ramirez" who did everything. After the detective told Matthew P. that she did not believe his story, Matthew P. for the first time admitted that he and Dempsey committed the crime.

5

At trial, Matthew P. testified that he and Dempsey "[c]lobbered the pizza man" on May 19, 2019. He testified that there is no Jacob Ramirez and he gave a false statement to the sergeant when he was arrested because he did not want to get into trouble. Matthew P. elaborated that he had traveled from Laughlin, Nevada to San Diego with Dempsey to meet Michelle, who lived in Pine Valley. Someone dropped them off on the street in El Cajon and it was his idea to order pizza because he was hungry and wanted money. Matthew P. was the one who told T.T. to " '[g]ive me your shit,' " and Dempsey was the one who hit T.T. with a stick. Matthew P. and Dempsey were wearing blue bandanas.

E. *The Jury Finds Dempsey Guilty of Robbery and Carjacking*

The jury found Dempsey guilty of robbery and carjacking. However, the jury found that Dempsey did not personally use a dangerous and deadly weapon and did not personally inflict great bodily injury upon T.T. in the commission of those crimes. Finally, the jury found Dempsey not guilty of assault with a deadly weapon.

DISCUSSION

A. *Prosecutorial Misconduct*

Dempsey argues the prosecutor committed prosecutorial misconduct by misstating the burden of proof at the end of his opening statement, which Dempsey claims allowed the jury to believe that it only needed to come to a reasonable conclusion in order to convict, in violation of *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*). He urges the prosecutorial error was prejudicial, requiring reversal. We conclude it is not reasonably likely that the jury misunderstood the prosecution's burden of proof or applied the wrong standard. Therefore, no prosecutorial misconduct occurred, and we do not reach the issue of prejudice.

1. *Additional Facts*

On March 4, 2020, after the jurors were sworn and before opening statements, the court informed the jury that it would "now explain the presumption of innocence and the People's burden of proof." The court then instructed the jury with CALCRIM No. 220 on reasonable doubt, stating:

> "The defendant has pleaded not guilty to the charges. The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true.
>
> "You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial. A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove the defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.
>
> "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt. In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

The court ended its remarks by stating "[a]t this time the People may make their opening statement outlining what they believe the evidence will show in the case. Remember, what the attorneys say is not evidence. Their statement is to assist you in understanding the case to be presented."

During his opening statement, the prosecutor summarized the evidence that he intended to present and concluded by stating "[a]t the end of the case what I'm going to ask you to do is listen to the evidence and come to a

7

reasonable conclusion and hold the defendant accountable for what he did to [T.T.]. Thank you."

Defense counsel requested a recess before his opening statement to put an objection on the record. Once the jury was excused, defense counsel objected to the prosecutor's statement as prosecutorial misconduct under *Centeno*, arguing that "the prosecution's burden is not met by saying that their conclusion is reasonable." The court acknowledged "[i]t has to be more than a reasonable conclusion. [¶] . . . [¶] It has to be beyond a reasonable doubt." The court then stated "[i]t was kind of a misstatement, but I don't think it rises to that level."

The prosecutor responded "[o]bviously I did not intend for that to happen. . . . What *Centeno* says is that if my version of events is reasonable, therefore I've reached my burden. I don't think that's what I said. What I said is I'm asking you to make a reasonable conclusion based on the evidence."

The court concluded that "[i]t's a matter of semantics, but it does not rise to misconduct or a basis for a mistrial." When defense counsel asked if the court could give a curative instruction or whether the court would like defense counsel to handle it in his opening, the court responded, "You can clarify it." Defense counsel confirmed, stating, "Thank you. I can do that."

Once the jury returned, defense counsel began his opening by addressing the standard of proof, stating:

> "Good afternoon. The question you're going to have to decide in this case is whether Courtlen Dempsey participated in this robbery beyond a reasonable doubt. That's going to be the standard of proof. Not whether it's reasonable, but proof beyond a reasonable doubt. That's the question you are going to have to ask."

8

The jury heard testimony on March 4, 5, and 9, 2020. On March 9, 2020, after the defense rested, the court instructed the jury on the law, premised with the following statement:

> "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorney's comments on the law conflict with my instruction, you must follow my instructions."

Among other instructions, the court again gave the CALCRIM No. 220 instruction on the burden of proof.

After instructing the jury on the law, the court stated:

> "I have instructed you on the law. When we resume at 1:30 the attorneys will make their agreements [*sic*] as to how they feel you should interpret the evidence. The People will make their opening argument, and then the defense will make its argument. Since the People have the burden of proving the defendant guilty beyond a reasonable doubt, they will then give their closing argument. Remember that the arguments of counsel are not evidence. If either attorney misstates the evidence or the law you will rely are [*sic*] on the evidence presented in the trial and the law as stated by me."

The prosecutor began his closing argument as follows:

> "Good afternoon, members of the jury. So the first thing I want to discuss is the burden of proof in this case. The burden of proof is beyond a reasonable doubt. When we were going through the jury selection process, I believe there was a juror who said something to the effect of, 'Well if I have a doubt then I would acquit.' I just want to make sure that when you're deciding this case you're using the appropriate language. It's beyond a reasonable doubt, because everything in life is open to some possible or imaginary doubt. The instruction that applies to the burden of proof is CALCRIM [No.] 220. I encourage you, and I emphasize that you please read and follow it. It is, in fact, the law.

9

"I just want to emphasis [*sic*] that the defendant has no burden of proof. The burden of proof rests entirely on the prosecution, the government. Okay. Again, defendant is presumed innocent, and that presumption requires that the prosecution, myself, and the detective, and evidence you've heard throughout the case prove the defendant guilty beyond a reasonable doubt.

"There may have been a comment I made in [my] opening statement. If I spoke inconsistently with the evidence, I want you to disregard it—or the law. It's not sufficient that the jury simply believe a conclusion is reasonable, it must be convinced that all necessary facts have been proven beyond a reasonable doubt. Now, at the same time, you are allowed to accept the reasonable and reject the unreasonable. You are allowed to do that as jurors."

Defense counsel also addressed the standard of proof in his closing argument, stating that "the government has the burden of proof. They have to prove Mr. Dempsey guilty beyond a reasonable doubt."

The prosecutor and defense counsel stipulated that the jury instructions would go into the jury room during deliberations. During deliberations, the jury did not submit any questions to the court or ask to have any testimony read back by the reporter.

2. *Applicable Law*

" '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements.' " (*People v. Hill* (1998) 17 Cal.4th 800, 829, quoting *People v. Marshall* (1996) 13 Cal.4th 799, 831.) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was a 'reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly

10

infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Centeno*, *supra*, 60 Cal.4th at p. 667, quoting *People v. Frye* (1998) 18 Cal.4th 894, 970.) We review a trial court's ruling on prosecutorial misconduct for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

3. *Analysis*

Dempsey takes issue with one sentence at the end of the prosecutor's opening statement: "At the end of the case what I'm going to ask you to do is listen to the evidence and come to a reasonable conclusion and hold the defendant accountable for what he did to [T.T.]." Dempsey argues that this comment constituted prosecutorial misconduct under *Centeno*. We disagree.

In *Centeno*, the prosecutor's closing argument "strongly implied that the People's burden was met if its theory was 'reasonable' in light of the facts supporting it." (*Centeno*, *supra*, 60 Cal.4th at p. 671.) She told the jury " 'your decision has to be in the middle. It has to be based on reason. It has to be a reasonable account. . . . [Y]ou need to look at the entire picture, not one piece of evidence, not one witness . . . to determine if the case has been proven beyond a reasonable doubt.' " (*Ibid.*) She continued: " 'Is it reasonable to believe that a shy, scared child who can't even name the body parts made up an embarrassing, humiliating sexual abuse, came and testified to this in a room full of strangers *or the defendant abused Jane Doe. That is what is reasonable, that he abused her.*' " (*Id.* at p. 671.) The prosecutor asserted: " 'Is it reasonable to believe that there is an innocent explanation for a grown man laying on a seven year old? No, that is not reasonable. . . . Is it reasonable to believe that the defendant is being set-up in what is really a very unsophisticated conspiracy led by an officer who has

11

never met the defendant *or he*['s] *good for it?  That is what is reasonable. He's good for it.' "* (*Id.* at pp. 671-672.)

The court in *Centeno* concluded that the prosecutor's statements in closing argument diluted the People's burden because they "left the jury with the impression that so long as her interpretation of the evidence was reasonable, the People had met their burden." (*Centeno, supra*, 60 Cal.4th at p. 672.)  Although the court confirmed it is acceptable for a prosecutor to argue that the jury should reject unreasonable interpretations of the evidence and consider only reasonable interpretations, the court explained "it is error for the prosecutor to suggest that a 'reasonable' account of the evidence *satisfies the prosecutor's burden of proof.*" (*Ibid.*)  "Here, the prosecutor did not simply urge the jury to ' "accept the reasonable and reject the unreasonable" ' in evaluating the evidence before it.  [Citation.]  Rather, she confounded the concept of rejecting unreasonable inferences with the standard of proof beyond a reasonable doubt.  She repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence." (*Id.* at p. 673.)

Unlike in *Centeno*, the prosecutor here did not suggest to the jury that a reasonable account of the evidence would satisfy the prosecution's burden of proof.  Rather, in his opening statement, the prosecutor merely asked the jury to "listen to the evidence and come to a reasonable conclusion and hold the defendant accountable for what he did to [T.T.]."  In contrast to *Centeno*, the prosecutor did not suggest to the jury that Dempsey was " *'good for it'* " just because the prosecution's account of the evidence was reasonable. (*Centeno, supra*, 60 Cal.4th at p. 672.)  Merely asking the jury to come to "listen to the evidence and come to a reasonable conclusion" without

12

suggesting that this is enough to satisfy the prosecution's burden of proof does not amount to prosecutorial misconduct.

Especially when considered in the context of the record in its entirety, we find no reasonable likelihood the jury would have understood the prosecutor's comments in an improper or erroneous manner. (*Centeno, supra*, 60 Cal.4th at p. 667.) The court instructed with CALCRIM No. 220 on reasonable doubt before the prosecutor's opening statement, and again at the end of the evidence, before the prosecutor's closing argument. The court also instructed the jury that to the extent an attorney's comments on the law conflicted with the court's instructions, the jury must follow the instructions. The jury is presumed to have done so. (*People v. Shazier* (2014) 60 Cal.4th 109, 150.) Moreover, immediately after the prosecutor's opening statement, defense counsel clarified to the jury that it had to decide "whether Courtlen Dempsey participated in this robbery beyond a reasonable doubt. That's going to be the standard of proof. Not whether it's reasonable, but proof beyond a reasonable doubt."

Most critically, the prosecutor himself made clear to the jury in closing argument that a "reasonable conclusion" was not enough to establish the prosecution's burden of proof beyond a reasonable doubt. At the beginning of his closing argument, the prosecutor emphasized that the "burden of proof is beyond a reasonable doubt" and encouraged the jury to read and follow the CALCRIM No. 220 instruction for the standard of proof. He then addressed the "comment I made in [my] opening statement" and told the jury to disregard it if he spoke inconsistently with the law, clarifying that "[i]t's not sufficient that the jury simply believe a conclusion is reasonable, it must be convinced that all necessary facts have been proven beyond a reasonable doubt."

13

Based on the record as a whole, it is not reasonably likely that the prosecutor's brief comment regarding a "reasonable conclusion" during his opening statement led the jury to apply an incorrect standard of proof. We therefore conclude no prosecutorial misconduct occurred.

B. *Electronics Search Probation Condition*

Dempsey challenges an electronics search condition of his probation as unconstitutionally overbroad. We conclude the condition is not facially overbroad because the nature of Dempsey's offense means that *some* electronics search condition could constitutionally be imposed. We also conclude Dempsey forfeited his ability to raise an as-applied challenge to the condition by failing to assert it below. Finally, his claim of ineffective assistance of counsel for defense counsel's failure to object to the probation condition fails.

1. *Additional Facts*

In his probation report, the probation officer recommended that the court deny probation and sentence Dempsey to five years in prison. The probation officer explained that he "seriously considered a grant of probation" given Dempsey's age and lack of criminal history, but "in considering the elements of the crime, the severity of the instant offense including the victim's injury, along with the defendant's admitted substance abuse" he ultimately recommended denying probation "in order to encourage the defendant to lead a law abiding life and deter him from future offenses as well as serve as a significant custodial sanction."

At the sentencing hearing, the prosecutor also urged the court to impose a prison sentence of five years. He argued the victim was a 52-year-old pizza delivery driver who "was brutally assaulted with a blunt object, he suffered 14 stitches to his head." According to the prosecutor, Dempsey "never, not once accepted responsibility or accountability for his actions, and

14

simply put, his actions were cruel." He further argued that the circumstances and aggravating factors of Dempsey's offense "does not deserve probation, not by a long shot. We cannot allow people to conspire and carjack pizza delivery drivers and get away with probation, that's not justice and that's what the People are asking is that the Court impose five years recommended by probation."

Defense counsel assured the court that Dempsey had expressed remorse from the beginning of the case and that he no longer had any contact with Matthew. He argued Dempsey had served a substantial time in custody, and if he were released on probation, he planned to move back to Laughlin, Nevada where his grandmother lived. Dempsey's daughter was also in Laughlin, Nevada in foster care with Dempsey's grandmother.

The court stated, "there is no mitigating this event, it was horrible, but what mitigates it is the defendant's age." The court noted Dempsey was 18 years old at the time of the crime, had no prior criminal history, and had already spent almost two years in jail. The court reasoned that Dempsey had "a lot of time hanging over his head" and "being the father of a child at this point in time and moving and separating himself from the co-defendant and his performance in jail, he has paid a pretty good price and he faces paying a steeper price." The court indicated that it intended to grant Dempsey formal probation.

The court then asked defense counsel if he had received the alternate recommendation, and defense counsel informed the court that he had not. Once he received it, there was a pause in the proceedings to allow defense counsel to review the conditions with Dempsey. The court then asked Dempsey if he understood the conditions. Dempsey confirmed that he did, and that he had no questions. The court informed Dempsey that he would be

released from custody that day and instructed him to contact the probation department no later than the following Tuesday. The court warned Dempsey that "you've got this prison hanging over your head. If you haven't learned anything in two years in jail, then you're a hopeless case, but I think you've got more going for you than that." The court again asked Dempsey if he understood and accepted the terms and conditions of his probation, which Dempsey confirmed.

The court suspended the imposition of a prison sentence and granted Dempsey three years formal probation. One of the probation conditions required Dempsey to "[s]ubmit person, vehicle, residence, property, personal effects, computers, and recordable media, cell phones, electronic devices, to search at any time with or without a warrant, and with or without reasonable cause, when required by P.O. or law enforcement officer."

2. *Applicable Law*

The warrantless search of electronic devices "significantly burdens privacy interests." (*In re Ricardo P.* (2019) 7 Cal.5th 1113, 1123.) "A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad." (*In re Sheena K.* (2007) 40 Cal.4th 875, 890 (*Sheena K.*).) " 'The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that perfection in such matters is impossible, and that practical necessity will justify some infringement.' " (*People v. Appleton* (2016) 245 Cal.App.4th 717, 723.) We review constitutional challenges to probation conditions de novo. (*Ibid.*)

16

"Any challenge to the closeness of fit between the condition and facts related to [the defendant's] crime or history is an as-applied constitutional claim." (*People v. Patton* (2019) 41 Cal.App.5th 934, 938 (*Patton*).) "An as-applied constitutional challenge [to a probation condition] is forfeited unless previously raised. [Citation.] . . . However, the forfeiture rule does not extend to facial constitutional challenges presenting pure questions of law that can be resolved without referring to the particular sentencing record developed below. [Citation.] A facial challenge 'does not require scrutiny of individual facts and circumstances but instead requires the review of abstract and generalized legal concepts.' " (*Id.* at p. 946, quoting *Sheena K.*, *supra*, 40 Cal.4th at pp. 885, 889.) Instead, it is a claim "that a condition cannot have *any* valid application, without relying on any facts in the sentencing record." (*Patton*, at p. 946.)

3. *Analysis*

To the extent Dempsey raises a facial challenge to the electronics search condition, it fails on the merits. This court has already rejected a facial constitutional challenge to a similar condition under similar circumstances, acknowledging that "there is a relationship between theft of electronic devices and the imposition of an electronic device search condition." (*Patton*, *supra*, 41 Cal.App.5th at p. 945.) Because Dempsey's offense involved both the theft of a cell phone *and* the use of a cell phone to commit the crime (i.e., to summon the pizza delivery person to a dark residential street), *some* electronics search condition could be constitutionally imposed. (*Id.* at pp. 946-947 ["A probationer whose underlying crime involved stealing cell phones may constitutionally be subjected to *some* electronics search condition"]; see also *In re Malik J.* (2015) 240 Cal.App.4th 896, 904 [rejecting an overbroad challenge to an electronics search condition as to a defendant

17

convicted of stealing cell phones, reasoning the condition would allow probation officers to determine whether devices in the probationer's possession were stolen].)

Dempsey argues that the condition "allows for a far greater impingement" on Dempsey's constitutional rights "than is warranted by the facts of this case." He urges the condition should be narrowed, for example, by limiting the condition to searches of his outgoing and incoming text messages and phone calls. But this amounts to an as-applied constitutional claim, challenging the closeness of fit between the condition and the facts related to Dempsey's offense, which Dempsey appears to acknowledge. Dempsey forfeited this as-applied claim by failing to raise an objection to the probation condition before the trial court. (*Sheena K.*, *supra*, 40 Cal.4th at p. 889; *Patton*, *supra*, 41 Cal.App.5th at p. 947.)

Dempsey argues this court has discretion to consider his as-applied claim because it involves fundamental constitutional rights. It is settled, however, that where challenges to a probation condition " 'do not present "pure questions of law that can be resolved without reference to the particular sentencing record developed in the trial court" ' " " ' "[t]raditional objection and waiver principles" ' " should apply. (*Sheena K.*, *supra*, 40 Cal.4th at p. 889, quoting *People v. Welch* (1993) 5 Cal.4th 228, 235-236.)

Alternatively, Dempsey asserts an ineffective assistance of counsel claim for defense counsel's failure to object to the electronics search probation condition. He argues there was no rational tactical purpose for counsel's failure to object to this condition as unconstitutionally overbroad.

We disagree. To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's

deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People v. Scott* (1997) 15 Cal.4th 1188, 1211.) It is "particularly difficult to establish ineffective assistance of counsel on direct appeal, where we are limited to evaluating the appellate record. If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*Id.* at p. 1212.)

On the appellate record alone, we cannot conclude that defense counsel's failure to object to the electronics search condition fell below an objective standard of reasonableness under prevailing professional norms. As we explain below, even assuming there might have been a legally viable overbreadth objection, there is a possible rational tactical reason that defense counsel did not object to the condition.

The probation officer and the prosecutor both urged the court to deny probation and issue a five-year prison term. At sentencing, the prosecutor argued strongly for a five-year prison term, asserting that, "It was a cruel, selfish act and it does not deserve probation not by a long shot." However, the court stated its intention to grant probation. The court then asked defense counsel if he had received the "alternate recommendation" with probation conditions. Defense counsel had not received it. The court provided it to defense counsel to review with Dempsey, and there was a pause in the proceedings while they did that off the record. Defense counsel then confirmed that he had gone over all the conditions of probation with Dempsey, and Dempsey confirmed he understood and accepted the conditions.

19

On this record, we cannot rule out the possibility that defense counsel and/or Dempsey decided not to challenge any of the proposed probation conditions because they did not want to risk having the court change its mind and impose a prison term, as the prosecutor and probation officer recommended. For all we can tell from the appellate record, Dempsey may even have directed defense counsel not to object to the conditions of probation during their off-the-record discussion. Thus, there was a possible rational tactical reason for not objecting to the electronics search condition, and we cannot find ineffective assistance of counsel based solely on the appellate record. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1052 [reviewing court will find ineffective assistance of counsel "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission"].)

C. *Custody Credits and Discretionary Fees and Fines*

Dempsey argues the sentencing minute order and the order granting formal probation must be corrected to reflect that all discretionary fees and fines were satisfied by Dempsey's time in custody because the court stated at the hearing that "[a]ll the discretionary fines are satisfied by [Dempsey's] time in custody." In response, the People contend that a remand for resentencing is necessary because the trial court improperly awarded Dempsey custody credits to which he was not entitled, and Dempsey did not have any excess custody credits to apply toward fees and fines. We agree remand is necessary for the court to correct its order granting formal probation to reflect the appropriate amount of custody credits for time served, clarify the number of days that the court ordered Dempsey to serve, and address whether any custody credits remain to satisfy discretionary fees and fines.

20

As of January 27, 2021, Dempsey had 734 days of custody credits: 639 days for actual time served, and 95 days pursuant to section 2933.1. At the sentencing hearing on February 26, 2021, the court stated it was granting Dempsey formal probation "on the following terms and conditions: You are to serve *1,277 days* in the custody of the sheriff with credit for the 639 actual days that you served plus *638 days of 4019 PC credits* for that total. [¶] All the discretionary fines are satisfied by [Dempsey's] time in custody." (Italics added.) The order granting formal probation, however, indicates Dempsey's commitment order was *365 days*, not 1277 days. It also indicates Dempsey was credited for 639 local days and *638 days under section 4019*, for a total of 1,277 days credit for time served. Finally, the order requires Dempsey to pay $1,415 in fees and fines but indicates that $820 was satisfied by credit for time served.

A remand for resentencing is necessary for several reasons. First, because Dempsey was convicted of a violent felony, his conduct credits under section 4019 should have been limited to 15 percent of the actual number of days served (95 days versus the 638 days awarded by the court). (§ 2933.1, subds. (a) & (c) [limiting presentence conduct credits awarded under section 4019 to no more than 15 percent of the actual period of confinement, for violent felonies as defined by section 667.5]; § 667.5, subd. (c)(9) [defining robbery as a violent felony]; *id.*, subd. (c)(17) [defining carjacking as a violent felony].) Second, the trial court must clarify the discrepancy between the number of days it ordered Dempsey to serve in its oral declaration during the sentencing hearing (1,277 days) versus the written order granting formal

21

probation (365 days).[3]  Finally, after making these corrections, the trial court must determine whether any credit for time served remains to satisfy fees and fines, and clarify any amount that Dempsey owes.

DISPOSITION

The judgment is affirmed.  The case is remanded for resentencing in accordance with this opinion.

BUCHANAN, J.

WE CONCUR:

DATO, Acting P. J.

DO, J.

---

[3]  We note that a sentence of 1,277 days imposed as a condition of probation would be unauthorized.  Section 19.2 limits the sentence imposed as a condition of probation to one year per offense.  (*People v. Jeffrey* (2004) 33 Cal.4th 312, 317; *People v. De Casaus* (1957) 150 Cal.App.2d 274, 280.) Here, there were only two offenses:  carjacking and robbery.